**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION**


**BART STRUBEN LOCKABY,**

     **Plaintiff,**

**vs.**                                                    **Case No.  1:14cv76-MP/CAS**

**CAROLYN W. COLVIN,
Acting Commissioner of the Social
Security Administration,**

     **Defendant.**

_____/


## REPORT AND RECOMMENDATION

     This is a Social Security case referred to the undersigned magistrate judge for a

report and recommendation pursuant to 28 U.S.C. § 636(b) and Local Rule 72.2(D).  It

is now before the Court pursuant to 42 U.S.C. § 405(g) for review of the final

determination of the Acting Commissioner (Commissioner) of the Social Security

Administration (SSA) denying Plaintiff's application for a period of disability and

Disability Insurance Benefits (DIB) filed pursuant to Title II of the Social Security Act

(Act) and an application for Supplemental Security Income (SSI) pursuant to Title XVI of

the Act.  After consideration of the record, it is recommended that the decision of the

Commissioner be affirmed.

## I.  Procedural History

     On April 27, 2011, Plaintiff, Bart Struben Lockaby, filed applications for DIB and

SSI alleging disability beginning August 10, 2008.  R. 29, 183, 188, 208.  (Citations to

the Record shall be by the symbol ("R.") followed by a page number that appears in the lower right corner.)  Plaintiff's date last insured for DIB is March 31, 2011.  R. 29, 209.

Plaintiff's application was denied initially on June 22, 2011, and upon reconsideration on September 1, 2011.  R. 29, 93-96.  On October 19, 2011, Plaintiff requested a hearing.  R. 29, 125-26.  Plaintiff was represented by Joshua Avrum Kesselman, an attorney, with The Law Offices of Rotstein & Shiffman.  R. 29, 43, 45, 97-100, 169-70.  On November 8, 2012, Administrative Law Judge (ALJ) Patrick F. McLaughlin held a hearing in Jacksonville, Florida.  R. 29, 43-83.  Plaintiff testified. R. 46-70, 82-83.  Charles Kimball Heartsill, an impartial vocational expert, testified. R. 29, 70-81, 127-30 (Resume).

On January 22, 2013, the ALJ issued a decision and denied Plaintiff's applications for benefits concluding that Plaintiff was not disabled from August 10, 2008, through the date of the ALJ's decision.  R. 29-38.  On February 19, 2013, Plaintiff requested review of the ALJ's decision and submitted a letter/brief.  R. 171-80.  On February 21, 2014, the Appeals Council considered Plaintiff request, including additional evidence and Plaintiff's letter/brief (Exhibits 14F-16F, 17B), and denied Plaintiff's request for review of the ALJ's decision, making the ALJ's decision the final decision of the Commissioner.  R. 1-7, 171-80 (Exhibits 17B), 457-592 (Exhibits 14F-16F); *see* 20 C.F.R. § 404.981.

On April 23, 2014, Plaintiff filed a Complaint with the United States District Court seeking review of the ALJ's decision.  Doc. 1.  The parties filed memoranda of law, docs. 14 and 15, which have been considered.

## II.  Findings of the ALJ

The ALJ made several findings relative to the issues raised in this appeal:

1. "The claimant engaged in substantial gainful activity (SGA) during the following periods: 1st and 2nd quarters of 2009. . . .  However, there has been a continuous 12-month period(s) during which the claimant did not engage in substantial gainful activity.  The remaining findings address the period(s) the claimant did not engage in substantial gainful activity."  R. 31.

2. "The claimant has the following severe impairments: history of knee pain and hypertension."  R. 32.  The ALJ expressly found that Plaintiff's "alleged visual problems and kidney problems represent non-severe impairments."  *Id.*

3. "The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1."  *Id.*  The ALJ determined, in part, that "[d]espite the claimant's combined impairments, the medical evidence does not document listing level severity, and no acceptable medical source has mentioned findings equivalent in severity to the criteria of any listing, individually or in combination."  *Id.*

4. "[T]he claimant has the residual functional capacity [RFC] to perform *medium* work as defined in 20 CFR 404.1567(c) and 416.967(c) except with no more than frequent climbing, balancing, and stooping; no kneeling or crawling; and no more than occasional exposure to hazards and heights, and frequent exposure to pulmonary irritants."  R. 32 (emphasis added).[1]

5. "The claimant is capable of performing past relevant work as a truck driver, heavy; and garbage collector driver.  This work does not require the performance of work-related activities precluded by the claimant's [RFC]."  R. 37.

6. "The claimant has not been under a disability, as defined in the Social Security Act, from August 10, 2008, through the date of [the ALJ's] decision."  R. 38.

## III.  Legal Standards Guiding Judicial Review

---

[1]  "Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds.  If someone can do medium work, we determine that he or she can also do sedentary and light work."  20 C.F.R. §§ 404.1567(a), 416.967(c).

This Court must determine whether the Commissioner's decision is supported by substantial evidence in the record and premised upon correct legal principles. 42 U.S.C. § 405(g); Chester v. Bowen, 792 F.2d 129, 131 (11th Cir. 1986). "Substantial evidence is more than a scintilla, but less than a preponderance. It is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983) (citations omitted); accord Moore v. Barnhart, 405 F.3d 1208, 1211 (11th Cir. 2005). "The Commissioner's factual findings are conclusive if supported by substantial evidence." Wilson v. Barnhart, 284 F.3d 1219, 1221 (11th Cir. 2002) (citations omitted). The court may not reweigh the evidence or substitute its own judgment for that of the ALJ even if it finds that the evidence preponderates against the ALJ's decision. Moore, 405 F.3d at 1211.[2]

"In making an initial determination of disability, the examiner must consider four factors: '(1) objective medical facts or clinical findings; (2) diagnosis of examining physicians; (3) subjective evidence of pain and disability as testified to by the claimant and corroborated by [other observers, including family members], and (4) the claimant's age, education, and work history.'" Bloodsworth, 703 F.2d at 1240 (citations omitted).

_____

[2]   "If the Commissioner's decision is supported by substantial evidence we must affirm, even if the proof preponderates against it." Phillips v. Barnhart, 357 F.3d 1232, 1240, n.8 (11th Cir. 2004) (citations omitted). "A 'substantial evidence' standard, however, does not permit a court to uphold the Secretary's decision by referring only to those parts of the record which support the ALJ. A reviewing court must view the entire record and take account of evidence in the record which detracts from the evidence relied on by the ALJ." Tieniber v. Heckler, 720 F.2d 1251, 1253 (11th Cir. 1983). "Unless the Secretary has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's 'duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.'" Cowart v. Schweiker, 662 F.2d 731, 735 (11th Cir. 1981) (citations omitted).

A disability is defined as a physical or mental impairment of such severity that the claimant is not only unable to do past relevant work, "but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 423(d)(2)(A).  A disability is an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A); *see* 20 C.F.R. § 404.1509 (duration requirement).[3] Both the "impairment" and the "inability" must be expected to last not less than 12 months.  Barnhart v. Walton, 535 U.S. 212 (2002).  In addition, an individual is entitled to DIB if he is under a disability prior to the expiration of her insured status.  *See* 42 U.S.C. § 423(a)(1)(A); Moore v. Barnhart, 405 F.3d at 1211; Torres v. Sec'y of Health & Human Servs., 845 F.2d 1136, 1137-38 (1st Cir. 1988); Cruz Rivera v. Sec'y of Health & Human Servs., 818 F.2d 96, 97 (1st Cir. 1986).

The Commissioner analyzes a claim in five steps.  20 C.F.R. § 404.1520(a)(4)(i)-(v).

1.    Is the individual currently engaged in substantial gainful activity?

2.    Does the individual have any severe impairments?

3.    Does the individual have any severe impairments that meet or equal those listed in Appendix 1 of 20 C.F.R. Part 404, Subpart P?

---

[3]  The relevant DIB and SSI regulations are virtually identical.  As a result, citations will be made to the DIB regulations found at 20 C.F.R. §§ 404.1500-404.1599, unless a SSI regulation provides otherwise.  The parallel regulations are found at 20 C.F.R. §§ 416.900-416.999, corresponding to the last two digits of the DIB citations, e.g., 20 C.F.R. § 404.1563(c) corresponds to 20 C.F.R. § 416.963(c).

4.      Does the individual have the RFC to perform work despite limitations and are there any impairments which prevent past relevant work?[4]

5.      Do the individual's impairments prevent other work?

A positive finding at step one or a negative finding at step two results in disapproval of the application for benefits.  A positive finding at step three results in approval of the application for benefits.  At step four, the claimant bears the burden of establishing a severe impairment that precludes the performance of past relevant work.  Consideration is given to the assessment of the claimant's RFC and the claimant's past relevant work. If the claimant can still do past relevant work, there will be a finding that the claimant is not disabled.  If the claimant carries this burden, however, the burden shifts to the Commissioner at step five to establish that despite the claimant's impairments, the claimant is able to perform other work in the national economy in light of the claimant's RFC, age, education, and work experience.  Phillips, 357 F.3d at 1237; Jones v. Apfel, 190 F.3d 1224, 1229 (11th Cir. 1999); Chester, 792 F.2d at 131; MacGregor v. Bowen, 786 F.2d 1050, 1052 (11th Cir. 1986); 20 C.F.R. § 404.1520(a)(4)(v), (e) & (g).  If the Commissioner carries this burden, the claimant must prove that he or she cannot perform the work suggested by the Commissioner.  Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).

## IV.  The Evidence

### A.  Plaintiff's Hearing Testimony

---

[4]  A residual functional capacity (RFC) is the most a claimant can still do despite limitations.  20 C.F.R. § 404.1545(a)(1).  It is an assessment based upon all of the relevant evidence including the claimant's description of her limitations, observations by treating and examining physicians or other persons, and medical records.  Id.  The responsibility for determining claimant's RFC lies with the ALJ.  20 C.F.R. § 404.1546(c).

The ALJ summarized Plaintiff's hearing testimony.

> At the hearing, the claimant testified to last working in October of 2008 at which time he was laid off due to the economy.  He stated that he had applied for jobs every year since the layoff.  He stated that he also collected unemployment benefits from 2007-2009.[5]  The claimant testified to having past work as a truck driver, installing fences, maintenance worker, arc welder, garbage truck driver.  He stated that he could not perform these jobs due to pain in his knees and shoulders.  The claimant testified to cutting back on alcohol about eight months ago.  He stated that he used to drink a pint of liquor every 1-2 days as well as two six-packs of beer; however, he currently only had a couple beers during the week and a couple shots of bourbon.  The claimant testified that he received treatment through Archer Family Medical Center.  He stated that he could sit for 45 minutes at one time, stand for a half hour, walk 300-400 feet, and lift about 50 pounds.  He stated that he could drive for about a half hour/30-40 miles before needing to stop and rest.  The claimant testified that he lived with a friend (he took care of her place in exchange for a place to stay).  He stated that during the day, he fooled around out in the shed (tinkered on weed eater and lawnmower (cleaned carburetor/took them apart and sharpened blades)).  He stated that he did all the lawn maintenance suing [sic] a riding lawn mower.  The claimant testified that he went shopping at Wal-Mart or the grocery store, but used a motorized cart.  He stated that he washed dishes, did a little vacuuming and cleaning, and did his own laundry.[6]  He stated that he had arthritis/tendonitis in his shoulders and arms, flared up all the time.  He stated that he took Flexeril, which helped some.  The claimant testified that his pain level was a 5/10.  He stated that he used a cane due to knee pain.  He stated that he had fallen 15-20 times in the past year.

R. 33; *see* R. 46-70, 82-83 (Plaintiff's hearing testimony).

The ALJ noted Plaintiff's testimony that he uses a cane due to knee pain, but

further noted that "during a consultative exam [with Dr. Chodosh, *see infra* at 10-12], the

---

[5]  The ALJ noted, in part, that by accepting these benefits, Plaintiff acknowledged "that he was ready, willing, and able to work.  The receipt of unemployment benefits also demonstrates a certain level of functioning because the claimant had to make regular reports to the state and search for jobs in order to qualify."  R. 36.

[6]  Plaintiff described his daily activities that the ALJ determined were "not entirely limited" and were not "consistent with" the ALJ's RFC assessment.  R. 35.  The ALJ enumerated several daily activities appearing in the record, including Plaintiff being able to drive up to 100 miles at a time; being able to lift 50 pounds, sit 45 minutes at one time, and stand 30 minutes at one time; and other activities mentioned during the hearing.  *Id.*

claimant reported being able to walk without an assistive device (Exhibit 5F).

Furthermore, there is no evidence in the file from his treating physician documenting the

need for an assistive device."  R. 36.  The ALJ noted

> that the claimant stopped working due to a business-related layoff rather than
> because of the allegedly disabling impairments (Exhibits 2E/2 and 5F/2), and
> hearing testimony).  Further, there is no evidence of a significant deterioration in
> the claimant's medical condition since that layoff.  A reasonable inference,
> therefore, is that the claimant's impairments would not prevent the performance
> of that job, since it was being performed adequately at the time of the layoff
> despite a similar medical condition.

R. 36.

The ALJ also noted than an additional factor influencing his decision was

Plaintiff's "generally unpersuasive appearance and demeanor while testifying at the

hearing," although the ALJ emphasized "that this observation is only one among many

being relied on in reaching a conclusion regarding the credibility of the claimant's

allegations and the claimant's [RFC]."  *Id.*  Overall, the ALJ found Plaintiff's descriptions

of his symptoms and limitations to be "inconsistent and unpersuasive."  *Id.*  The ALJ

also noted that the "record also includes statements by the claimant's treating physician

suggesting that the claimant has exaggerated symptoms (Exhibit 12F)."  *Id.*; *see, e.g.*,

R. 392, 396, 408, 414.

### B.  Medical Evidence

Plaintiff's alleged onset of disability date is August 10, 2008.  R. 29.  Plaintiff's

medical records did not show any treatment until October 2009 at Archer Family Health

Care (Archer).  Plaintiff's Archer records show treatment from October 2009 through

October 2012, primarily for knee pain and hypertension.  R. 34-35, 293-300, 303-11,

360-73, 387-403, 406-49; *see* R. 34.  Plaintiff's Archer records between October 2009

and March 2012 rarely showed upper extremity testing and generally unremarkable strength and range of motion when upper extremity testing was conducted. R. 34-35, 293-300, 303-11, 360-73, 416-49; *but see* R. 392 (Oct. 3, 2012, Archer note re: extremities (RLE): "no edema, decreased ROM and strength with exaggerated pain response and delayed reaction to manipulation"; (LLE): "normal ROM and strength, no joint enlargement or tenderness"). The ALJ noted that there is "a significant gap" in Plaintiff's treatment records; there are no records from Archer "after January of 2011 until May of 2011"; and that Plaintiff's treatment has been "essentially routine and/or conservative in nature." R. 36. (It appears the gap is from January 2010 until May 2011. *See* doc. 14 at 4; R. 34.)

On October 26, 2009, Plaintiff presented to Archer to establish care. R. 299-300. He complained of left knee pain and swelling for the past eight months to one year. R. 299. Plaintiff reported that the pain was located just above his knee and radiated down the lateral side of his leg and also up to his left hip. *Id*. Physical examination revealed:

> Obvious edema-probable fluid collections: 1 superior and medial to patella, the other superior and lateral to patella and is larger. Both are areas that [patient] identifies as tender. No erythema or heat. Full ROM [range of motion] to right knee, left knee with limited flexion and extension. Joint stable. No edema to left lower leg. Trapezius muscles tight and TTP bilaterally.

*Id*. Hillary Morris, ARNP's assessment included left knee pain and edema, hypertension and upper back pain, likely trapezius muscle spasm. R. 300. On November 11, 2009, Plaintiff had x-rays of his left knee which revealed "minimal medial joint space narrowing" and joint effusion. "No concerning bony or articular abnormalities are seen." R. 284. Similar impressions were noted based on x-rays of Plaintiff's left hip. R. 285.

On December 15, 2009, Shenary Cotter, M.D., performed a left knee arthrocentesis for Plaintiff.  R. 302.  Dr. Cotter noted that she was unable to draw any fluid.  *Id.*  She opined Plaintiff needed a magnetic resonance imaging (MRI) scan of his left knee and most likely needed surgery.  *Id.*  On January 5, 2010, Plaintiff had an MRI scan of his left knee which revealed:

> 1.  Focal full thickness chondral defect with a chondral flap in the medial patella articular cartilage.  There is underlying subchondral cystic change and marrow edema.

> 2.  Focal near full thickness chondral abnormality with subchondral marrow edema along the posterior surface of the medial femoral condyle.  The overlying cartilage surface appears intact.

> 3.  Moderate left knee joint effusion.

R. 282.

On May 18, 2011, Plaintiff returned to Archer complaining of an insect bite (chief complaint), insomnia, knee pain and soreness, and kidney pain.  R. 293, 308, 447.  His gait and station were normal.  There was no clubbing, cyanosis, petichiae, or nodes. R. 295, 306, 449.  On June 1, 2011, Plaintiff had a follow-up visit with Jennifer Donelan, ARNP, at Archer.  R. 303.   His chief complaints were hypertension and knee pain.  *Id.*; *see* R. 364-72.

On June 16, 2011, Plaintiff saw Lance I. Chodosh, M. D., for a consultative physical examination at the request of the Division of Disability Determinations.  R. 313-320; *see* R. 34-35 (ALJ's consideration of Dr. Chodosh's examination).  Plaintiff reported complaints of a three-year history of left knee pain.  R. 313.  He reported that his knee was always swollen and sore and occasionally popped and gave way.  *Id.* Plaintiff reported that he was unable to walk extensively and had special difficulty going

up and down stairs.  *Id.*  Plaintiff reported that he was a truck driver and was unable to

use his left leg to push the clutch on a truck.  *Id.*  Plaintiff was able to walk without the

use of an assistive device.  *Id.*  Plaintiff reported his knee pain interferes with sleep.  *Id.*

Dr. Chodosh noted that Plaintiff

> last worked two years ago, driving a roll-off truck, delivering construction boxes
> and equipment.  He did that work for more than two years, but was laid off
> because of lack of work and also because of his physical problems he was
> having.  In the past he was a construction worker, garbage worker, millwright,
> foundry worker, and maintenance and repair worker.  He is divorced and lives
> with a friend.  He has a GED and is literate.

*Id.*

> Dr. Chodosh noted under "Functional Status" that Plaintiff

> is generally independent in activities of daily living, but has difficulty getting
> dressed, must hold on while pulling up pants.  He cannot walk more than one-
> half block at a time and cannot stand continuously for more than 30 minutes.  He
> can sit, but has difficulty getting up from a seated position.  He can bend over
> carefully at the waste.  He can squat occasionally.  *He is able to lift.  He cannot
> carry more than 20 pounds occasionally.*  His hands cramp, but they function
> well.  He can drive, but not more than 100 miles at a time.  Vision corrects well.
> He does not hear well on the right side, but does not require amplification.
> Speech is normal.

*Id.* (emphasis added).  Dr. Chodosh observed that Plaintiff appeared "[w]eathered and

poorly conditioned," and a "significantly overweight man of large build.  He is fully

oriented, has normal speech pattern, and quiet affect.  Thought content is not assessed,

but does not seem abnormal.  He is cooperative, but exhibits very mild pain behavior.

Hygiene is fair."  R. 314.  Regarding Plaintiff's extremities, Dr. Chodosh noted that there

was no edema, cyanosis, clubbing, or significant varicosity.  R. 315.  There was a left

suprapatellar effusion; the swollen area was unusually warm, but not red.  Regarding

his back and spine, Plaintiff had no deformity or paraspinal muscular spasm.  Plaintiff

reported tenderness on both sides of the lumbar region; straight leg raising was

negative to 75 degrees bilaterally while supine, limited to by very tight hamstrings, and the maneuver was negative to 90 degrees bilaterally while sitting.  *Id.*  From a neurologic standpoint, Plaintiff's motor function was grossly normal and all four extremities had strength judged at 5/5 throughout, including grips.  Plaintiff's manual dexterity was normal (able to write, remove and replace the screw cap on a small bottle); coordination was good; no drift of outstretched arms; and sensation was normal to soft touch and pin.  *Id.*  Plaintiff's standing balance was normal.  He walked slowly, with a slight limp favoring the left leg and he was barely able to walk on his heels and toes.  Plaintiff indicated an inability to squat and rise.  R. 316.

Dr. Chodosh's impressions included chronic active alcoholism; hypertension, not fully controlled, but without obvious complications; inflammatory process in or about the left knee that could represent a bursitis, subacute gout, or other periarticular process. Dr. Chodosh advised that an x-ray of Plaintiff's left knee should be done.  *Id.*  For the most part, range of motion tests were normal, including flexion and extension of Plaintiff's knees. R. 317-18.  Dr. Chodosh concluded: "Based only on objective evidence this person is generally able to stand and walk.  He can sit.  He can bend over at the waist.  He probably cannot squat well.  *He can lift.  He can carry 20 to 40 pounds occasionally.*  He can handle objects.  He can see, hear, and speak in a relatively normal manner."  R. 316.  (emphasis added).

On June 21, 2011, non-examining, non-medical state agency consultant (Tyrolyn Odems) reviewed the record and opined that Plaintiff was capable of performing light work except he could never climb ladders, ropes, or scaffolds.  R. 321-23 (Exhibit 6F). The consultant opined that Plaintiff could perform other postural functions on an

occasional basis, R. 323, and further opined that Plaintiff should avoid concentrated exposure to vibration, fumes, odors, dusts, gases, poor ventilation, and hazards.[7] R. 325.

On July 4, 2011, Plaintiff was seen at the emergency department at Shands At The University of Florida (Shands).  R. 329-33.  He was bit and scratched by his cat at home.  R. 330.  His alcohol use was one pint of alcohol every other day along with beer.  R. 331; *see* R. 314.  Plaintiff had normal ROM, but exhibited tenderness during a musculoskeletal examination.  *Id.*; *see* R. 339-55, 464-80 (follow-up visits at Shands).

On August 30, 2011, a non-examining state agency consultant (Loc Kim Le, M.D.) reviewed the record and opined that Plaintiff could perform medium work except he could only frequently kneel with "[k]neeling limited to frequent due to pain."  R. 374-76.  Dr. Le reviewed several objective findings, including the Archer records, Dr. Chodosh's findings, and Plaintiff's reported daily activities and noted: "Based on the above objective findings, the claimant's statements are found little credible."  R. 379, 381.  Dr. Le acknowleged that Dr. Chodosh opined Plaintiff could lift twenty to forty pounds, but indicated the unremarkable neurological and strength testing of record supported an ability to do medium exertional work with some postural limitations.  R. 380.  The ALJ gave Dr. Le's opinion some weight although he mentioned Dr. Le was a non-examining consultant.  R. 37.

On September 30, 2011, Plaintiff had a follow-up office visit at Archer with Nurse Donelan complaining of vertigo and a fall six weeks prior.  R. 433-37; *see* R. 35.  He complained of knee pain; "continued pain and swelling.  No treatment."  R. 434.  A note

---

[7]  The ALJ referred to this exhibit as a non-examining physician's opinion and gave some weight to this opinion.  R. 37.  This opinion was given by a single decision-maker.  R. 328.

stated: "Did not get a stress since he started a new job has been busy.  No increase in chest pain, would like to reschedule this."  *Id.*  Plaintiff denied back and joint pain.  He denied "muscle impairment, weakness, numbness/tingling, seizures, slurred speech, tremors, paralysis on both sides."  *Id.*  Plaintiff's neurologic examination was relatively normal with gait referred to as "normal native and stress (tandem/heel/toe walking)"; and motor, tone, and strength described as "normal tone and muscle bulk with no pronator drift; no atrophy or fasciculations present; strength 5/5 throughout."  R. 436.

On November 7, 2011, Plaintiff returned to Archer for a follow-up appointment.  R. 427; *see* R. 35.  He reported complaints of pain and swelling in his knee.  *Id.* Physical examination revealed moderate inflammation and swelling above Plaintiff's left knee.  R. 430.  Plaintiff's knee was tender to palpation and he had a very limited range of motion.  *Id.*  It was noted that Plaintiff was limping as he was unable to fully bear weight on his left leg.  *Id.*

On February 20, 2012, Plaintiff returned to Archer for a follow-up appointment.  He reported complaints of left knee and left flank pain.  R. 423.  On April 11, 2012, Plaintiff returned to Archer and reported complaints of left shoulder and upper back pain.  R. 412.  Physical examination of the left shoulder revealed a decreased range of motion, normal range of motion and strength in his right upper extremity, no joint enlargement in either upper extremity, normal tone and muscle bulk, but a positive empty can test, and there was also diffuse tenderness of the tricep.  Right and left lower extremity tests showed normal ROM and strength, no joint enlargement or tenderness.  R. 412-15.  Plaintiff's gait and station were normal; there was no clubbing, cyanosis, petechiae, or nodes; he had decreased left bilateral bending; and "normal alignment

and mobility, diffuse tenderness to left trapezius and sternocleidomastoid muscle, exaggerated pain reaction throughout exam," but had "tenderness in flank area bilat." R. 414.  Plaintiff was prescribed Flexeril and advised to apply ice to his shoulder, back, and neck.  R. 415.

On June 22, 2012, Plaintiff returned to Archer and reported complaints of continuing debilitating knee pain and it was noted that he limped to the examination table, although he reported his shoulder pain had improved.  His gait and station was described as "limping."  Regarding his right lower extremities, it is noted that Plaintiff "flinches at even light touch to anywhere on knee, no erythema, no edema, joint stable with negative drawer, negative varus/valgus stress, hip with FROM."  His left lower extremity had normal ROM and strength, no joint enlargement or tenderness.  R. 400-02, 406-08; *see* R. 35.  On September 5, 2012, Plaintiff returned Archer and reported complaints of left shoulder pain and that his left knee kept collapsing and it was noted that he was limping.  No upper extremity testing was conducted and Plaintiff continued the same dose of Flexeril.  It was noted that Plaintiff was limping.  R. 394, 396-97.  On October 3, 2012, Plaintiff returned to Archer and it was noted that he limped to the table. R. 390, 392.  Physical examination revealed a decrease range of motion of his neck to the left.  R. 392.  It was noted that he had an exaggerated pain response when his knee was palpated.  *Id.*  On October 22, 2012, Plaintiff returned to Archer for a follow-up appointment for his left knee pain.  R. 387.  No additional complaints relating to his upper extremity pain were noted in his last visits in October 2012 and he continued to

take Flexeril.  R. 387-93.  On October 30, 2012, Plaintiff returned Archer for a punch biopsy of his left knee.[8]  R. 455.

## V. Legal Analysis

### Substantial evidence supports the ALJ's RFC assessment, his consideration of Dr. Chodosh's opinions, and his consideration of Plaintiff's credibility.

Plaintiff argues that the ALJ erred because he did not sufficiently explain his consideration of the lifting and carrying limitations in the opinion rendered by Dr. Chodosh.[9]  Doc. 14 at 8-10.  Plaintiff notes that the ALJ determined that Plaintiff has the RFC to perform medium work with exceptions.  Doc. 14 at 9.  After Dr. Chodosh discussed his examination results of Plaintiff, which included, in part, Plaintiff's three-year history of left knee pain, that Plaintiff "walks slowly, with a slight limp favoring the left leg," that "[h]e is barely able to walk on heels and toes" and "indicates an inability to squat and rise," R. 313-16, Dr. Chodosh provided his impressions and comments and concluded: "Based only on objective evidence this person is generally able to stand and walk.  He can sit.  He can bend over at the waist.  He probably cannot squat well.  *He can lift.  He can carry 20 to 40 pounds occasionally.*  He can handle objects.  He can see, hear, and speak in a relatively normal manner."  R. 316.  (emphasis added).

---

[8]  Plaintiff advises that additional medical records were submitted to the Appeals Council, which appear to be Exhibits 14F-16F.  Doc. 14 at 3 n.1; *see* R. 2, 6, 457-592. As noted by Plaintiff, the Appeals Council determined that the records from Shands were about a later time and would not affect the decision about whether Plaintiff was disabled beginning on or before January 22, 2013.  Doc. 14 at 3 n.1.  Plaintiff further noted that the other records submitted to the Appeals Council were mostly duplicative of what was already in the administrative record.  *Id.*  Plaintiff does not argue that these records should have been considered by the Appeals Council or should be considered by this Court.  Doc. 14.

[9]  Although an ALJ considers the opinions of State agency medical or psychological consultants, an ALJ is not bound by their findings.  *See* 20 C.F.R. § 404.1527(e)(2).

Plaintiff argues that the ALJ's RFC determination conflicts with Dr. Chodosh's opinion that Plaintiff could carry 20 to 40 pounds occasionally.  Doc. 14 at 9.  Plaintiff further argues that the ALJ erred because he did not discuss the weight, if any, he accorded his opinion.  Doc. 14 at 9-10.  Plaintiff also argues that the ALJ erred because he did not properly evaluate Plaintiff's allegations of pain and limitations.  Doc. 14 at 11-12.

In discussing the evidence supporting his RFC assessment limiting Plaintiff to medium work with some postural and environmental limitations, the ALJ noted Plaintiff's consultative examination (by Dr. Chodosh, Exhibit 5F, R. 313-19) "does not document any symptoms and/or limitations that would prevent the claimant from performing work activity within the established RFC."  R. 36.

During the hearing, the ALJ asked Plaintiff how much he could lift using both hands and Plaintiff replied: "I'd say right now, may be 50."  R. 61.  The ALJ noted this response twice in his decision.  R. 33, 35.  The first was in the context of Plaintiff's hearing testimony, R. 33, and the second when providing support for his RFC assessment, which included a discussion of Plaintiff's daily activities.[10]  R. 35.

Daily activities included performing various household chores, lawn maintenance, working in his shed tinkering on his weed eater and lawnmower and cleaning and taking apart the carburetor, shopping, washing dishes, vacuuming, doing light cleaning, doing

---

[10]  In evaluating Plaintiff's credibility, the ALJ may consider a claimant's daily activities when assessing the credibility of his complaints.  Macia v. Bowen, 829 F.2d 1009, 1012 (11th Cir. 1987); 20 C.F.R. § 404.1529(c)(3)(i) (providing that daily activities are relevant and can be considered by the ALJ when evaluating a claimant's symptoms); *but see* Lewis v. Callahan, 125 F.3d 1436, 1441 (11th Cir. 1997) ("participation in everyday activities of short duration, such as housework or fishing" does not disqualify a claimant from disability).  A claimant's ability to do some work, even at a low level, "may indicate that [he] is able to do more work."  Cooper v. Comm'r of Soc. Sec., 521 F. App'x 803, 808 (11th Cir. 2013) (unpublished).

laundry, and some work activity performed at substantial gainful activity levels after his alleged onset date.  R. 35-36, 61-62, 207, 220, 234, 276, 313.  *See* 20 C.F.R. § 404.1571.[11]  The ALJ also cited Plaintiff's treatment records showing generally routine and conservative treatment with medication in support of his RFC assessment.  R. 36, 293-300, 303-11, 360-73, 387-403, 406-49.  The ALJ also observed that no treating physician recommended or imposed any restrictions such that Plaintiff could not perform medium work.  R. 37.  The ALJ gave some weight to the opinion of state agency reviewing physician Dr. Le, who reviewed the medical evidence, including Plaintiffs' treatments records and Dr. Chodosh's evaluation results, and opined that Plaintiff could do a range of medium work.  R. 37, 374-81.

As noted above, Dr. Chodosh found Plaintiff had full 5/5 strength throughout, including grips, and normal motor function in all extremities.  R. 34, 315.  Plaintiff's extremities showed no edema, cyanosis, clubbing, or significant varicosity, and he had normal manual dexterity, good coordination, and normal sensations.  R. 34, 315. Consistent with the ALJ's RFC assessment indicating Plaintiff could lift no more than 50 pounds at a time, Dr. Chodosh opined Plaintiff could lift without qualification.  R. 32, 316.  (Plaintiff testified that he could "may be" lift "50" pounds with both hands.  R. 61.) Dr. Chodosh also opined Plaintiff could carry 20 to 40 pounds occasionally, which is not inconsistent with the ALJ's RFC assessment that Plaintiff could frequently lift or carry objects weighing up to 25 pounds.  R. 32, 316; *see generally* <u>McSween v. Astrue</u>, Civil

---

[11]  Plaintiff also reported that he had stopped working in 2008 because he was "laid off due to the economy," as opposed to health reasons and testified that he had continued to look for jobs ("[m]ostly driving jobs," R. 50) after his alleged onset date and received unemployment benefits through 2009.  The ALJ noted that by accepting unemployment benefits, Plaintiff acknowledged he was ready, willing, and able to work. R. 36; see R. 50, 57.

Action No. 1:12cv517-CSC (WO), 2014 U.S. Dist. LEXIS 13984, at *8-10 (M.D. Ala. Feb. 5, 2014).  Plaintiff does not explain how Dr. Chodosh's opinion that Plaintiff could lift without restriction and carry up to 40 pounds occasionally conflicts with medium work, which requires lifting up to 50 pounds at a time, with frequently lifting or carrying up to 25 pounds.  *See supra* at 3 n.1 (definition of medium work).

The ALJ expressly discussed what Plaintiff has identified as the pertinent element of Dr. Chodosh's opinion, such as the carrying restrictions, and in contrast to cases cited by Plaintiff, the ALJ's conclusions indicate that Dr. Chodosh's opinion was considered.[12]  R. 32, 34-35, 316.

Notwithstanding, the ALJ also considered Plaintiff's treatment records and determined they also supported an RFC to do a range of medium work.  The ALJ correctly observed that Plaintiff's medical records did not show any treatment until October 2009 at Archer, over a year after Plaintiff's alleged onset of disability of August

---

[12]  For example, Plaintiff relies on Sharfarz v. Bowen, 825 F.2d 278 (11th Cir. 1987), in which the court stated that, "[i]n assessing the medical evidence in this case, the ALJ was required to state with particularity the weight he gave the different medical opinions and the reasons therefor." *Id.* at 279. (citation omitted).  The Sharfarz record -- in contrast to the present case -- contained evidence regarding the claimant's work-related functional limitations from two treating physicians and one consultative examiner, which the ALJ rejected in favor of the functional capacity assessments rendered by two non-examining physicians.  The Eleventh Circuit found that ALJ's opinion that the claimant could return to his past work at the medium exertional level was supported only by the opinions of the non-examining physicians, and that the opinions "of all of the treating and examining physicians support the contrary finding." *Id.* at 280.  In Winshcel v. Comm'r of Soc. Sec., 631 F.3d 1176 (11th Cir. 2011), the Eleventh Circuit determined, in part, that an ALJ's failure to assign weight to a treating physician's opinion rendered the court unable to determine whether the ALJ's conclusions were supported by substantial evidence, because the ALJ also did not discuss pertinent elements of the treating physician's opinion (and the examining physician's opinion) and the conclusions suggested those elements were not considered. *Id.* at 1179.  Importantly, here, the ALJ noted that his review of the record "reveals no restrictions recommended by the treating doctor," R. 37, and the ALJ did not omit from consideration any relevant findings from Dr. Chodosh's report.  R 34-35.

10, 2008.  R. 36, 299-300.  Plaintiff's Archer records show treatment from October 2009 through October 2012 primarily for knee pain and hypertension.  R. 34-35, 293-300, 303-11, 360-73, 387-403, 416-49.  Plaintiff's Archer records between October 2009 and March 2012 rarely showed upper extremity testing and generally unremarkable strength and range of motion when upper extremity testing was conducted.  R. 34-35, 292-300, 303-11, 360-73, 416-49.

Further, Plaintiff started complaining of left shoulder pain in April 2012, but his exams showed generally unremarkable testing and he received conservative treatment. R. 36, 387-415.  Plaintiff's April 2012 exam showed decreased left shoulder range of motion, but also showed normal range of motion and strength in his right upper extremity, no joint enlargement in either upper extremity, and normal tone and muscle bulk.  R. 412-15.  Plaintiff was prescribed Flexeril and advised to apply ice to his shoulder, back and neck.  R. 415.  In a follow-up in June 2012, Plaintiff reported shoulder pain had improved.  R. 406.  In Plaintiff's next visit in September 2012, reported his shoulder pain still bothered him, but no upper extremity testing was conducted and Plaintiff continued the same dose of Flexeril.  R. 394, 396-97.  No additional complaints relating to upper extremity pain were noted in Plaintiff's last visits in October 2012 and, again, Plaintiff continued to take the same dose of Flexeril. R. 387-93.

The ALJ properly considered the relevant medical and opinion evidence, including the findings and opinion of Dr. Chodosh, in determining Plaintiff's RFC.  *See* 20 C.F.R. § 404.1545(a)(3).  The ALJ performed his duty, as the trier of fact, and weighed the evidence when assessing Plaintiff's RFC.  *See* Phillips v. Barnhart, 357

F.3d 1232, 1240 n.8 (11th Cir. 2004); <u>Wheeler v. Heckler</u>, 784 F.2d 1073, 1075 (11th Cir. 1986).  Substantial evidence supports the ALJ's RFC assessment that Plaintiff had the ability to perform medium work with some postural and environmental limitations.

Finally, Plaintiff also argues that the ALJ erred because he did not properly evaluate Plaintiff's allegations of pain and limitations.  Doc. 14 at 11-12.  The ALJ considered Plaintiff's various complaints that were presented in the medical records and during the hearing.  R. 33-37.  For the reasons stated above, the ALJ also considered Plaintiff's complaints recounted by Dr. Chodosh.  Substantial evidence supports the ALJ's credibility findings and his RFC assessment.  R. 35-37.

## VI. Conclusion

Considering the record as a whole, the findings of the ALJ are based upon substantial evidence in the record and the ALJ correctly applied the law.  Accordingly, it

is respectfully recommended that the decision of the Commissioner to deny Plaintiff's

applications for Social Security benefits be **AFFIRMED.**

      **IN CHAMBERS** at Tallahassee, Florida, on November 3, 2014.


                          **s/ Charles A. Stampelos_____**
                          **CHARLES A. STAMPELOS**
                          **UNITED STATES MAGISTRATE JUDGE**

## **NOTICE TO THE PARTIES**

      **A party may file specific, written objections to the proposed findings and
recommendations within 14 days after being served with a copy of this report and
recommendation.  A party may respond to another party's objections within 14
days after being served with a copy thereof.  Failure to file specific objections
limits the scope of review of proposed factual findings and recommendations.**